# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MICRO SIGNAL RESEARCH, INC. | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) CIVIL ACTION NO. |
|  | ) |
| NURI OTUS and MAUREEN CUNNINGHAM, | ) |
|  | ) |
| Defendants, | ) |
|  | ) |
| CUPERTINO NATIONAL BANK & TRUST | ) |
|  | ) |
| Trustee Process Defendant. | ) |

**04    12300**

MAGISTRATE JUDGE

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _____

## COMPLAINT

### I.    Introduction

Plaintiff seeks to recover $210,000 converted by fraud by the Defendants. In the

fall of 2003, Defendants who were then operating an auction website known as

AuctioNet.com that sold used equipment, approached Plaintiff and convinced him to

provide them $210,000 to buy certain equipment that he was told would be re-sold on

their web site at a profit. Plaintiff wired the funds to Cupertino National Bank & Trust to

facilitate the deal. Defendants never purchased the equipment – which Plaintiff found out

only when he traveled to California to view the equipment. At that point, Plaintiff only

refrained from going to the authorities or taking other legal action because Defendants,

through their counsel, admitted their wrongdoing and promised to re-pay the money.

Communications affirming the debt and promising to repay the money have continued

from counsel for Defendants from June 2004 to present to no avail. These

communications are attached to Plaintiff's affidavit submitted herewith. Plaintiff

recently discovered that Defendants have apparently closed their old web site, opened a new site and are holding an auction on October 28, 2004 to buy and sell equipment. It is likely that Defendants are using Plaintiff's funds to do so.

## II.    Parties

1.    Plaintiff Micro Signal Research, Inc. ("Plaintiff" or "MSR") is an a corporation registered to do business in the Commonwealth of Massachusetts with a principal place of business at 50 Oakdale Avenue, Weston, Massachusetts. Daniel Epstein ("Mr. Epstein") is President of MSR.

2.    Defendant Nuri Otus ("Mr. Otus") is an individual residing at 1872 Black Mountain Road, Hillsborough, CA 94010. At times relevant to this Complaint, Mr. Otus held himself out as the owner of AuctioNet, Inc. d/b/a actionet.com ("AuctioNet"), and he purportedly had offices at 1204 Middlefield Road, Suite 2C, Redwood City, CA 94063, and P.O. Box 631, Burlingame, CA 94011.

3.    Defendant Maureen Cunningham ("Ms. Cunningham") is an individual residing at 1872 Black Mountain Road, Hillsborough, California. Ms. Cunningham is Mr. Otus' wife. At times relevant to this Complaint, Ms. Cunningham also held herself out as a vice president and chief financial officer of AuctioNet.

4.    Upon information and belief, Trustee Process Defendant Cupertino National Bank & Trust ("Cupertino") is a national banking association with a place of business at 3 Palo Alto Square, Suite 150, Palo Alto, California.

## III.    Jurisdiction and Venue

5.    This Court has jurisdiction over this matter because Plaintiff and Defendants are residents of different states and the amount in controversy exceeds

2

$75,000. This Court has personal jurisdiction over Defendants pursuant to the
Massachusetts Long Arm Statute and the due process clause of the United States
Constitution. Defendants have initiated substantial contacts within the Commonwealth of
Massachusetts including but not limited to conducting continuous business within
Commonwealth of Massachusetts, approaching and inducing Plaintiff into the joint
venture discussed herein, and advertising within the Commonwealth of Massachusetts.
Venue is appropriate in this Court because Plaintiff has a principal place of business in
this judicial district.

**IV.    Allegations Common to All Counts**

6.     At all relevant times to this Complaint, Daniel Epstein ("Mr. Epstein")
was president of MSR.

7.     The entity known as AuctioNet purported to operate at a business address
located at 1204 Middlefield Road, Suite 2C, Redwood City, CA  94063 and P.O. Box
631, Burlingame, CA  94011.

8.     Mr. Otus represented that AuctioNet engaged in the business of buying
and selling, privately and at auction, used equipment. MSR had a previous business
relationship with AuctioNet through Mr. Otus in that MSR bought equipment both
directly and at auction from AuctioNet in the past. In or about September 2003, Mr. Otus
held himself out to MSR as owner and "auctioneer" of AuctioNet. However, it now
appears that there was never an entity incorporated either with the California or
Massachusetts secretary of state under the name AuctioNet.

9.     In or about late October 2003, in his purported capacity as owner of
AuctioNet, Mr. Otus proposed a joint business venture between AuctioNet and MSR.

The venture would purchase certain electronic equipment, which would later be sold at a profit privately and/or through auction. Mr. Epstein, on behalf of MSR, went to see a portion of the equipment proposed to be acquired with Mr. Otus in Dallas, Texas in or around early November 2003. The remaining equipment was purported by Mr. Otus to be in Pleasanton, California.

10.    Ultimately, the parties agreed to terms on the joint venture. The agreement provided that both parties would offer their expertise and services to the venture, along with a division of the costs, responsibilities and management duties.

11.    The deal between AuctioNet, primarily through Mr. Otus' representations, and MSR was primarily oral but was reflected in a series of e-mails exchanged from about October 24, 2003 to November 11, 2003.

12.    In order to induce MSR to enter the joint venture, Mr. Otus provided MSR, via e-mail, with a list of the equipment that was to be purchased and re-sold.

13.    On or about November 10, 2003, Mr. Otus sent Mr. Epstein an email communication instructing MSR to wire $210,000.00 to the Cupertino National Bank & Trust, 3 Palo Alto Square, Suite 150, Palo Alto, California, payable to AuctioNet.com, 1204 Middlefield Road, Redwood City, California, with a reference of "Data Return JV", a bank routing number of 121151152, and an account number 003110397.

14.    In a return email message, Mr. Epstein advised Mr. Otus that he was wiring Mr. Otus the $210,000.00 "today for my half share in the Data-Return deal on the spread sheets".

15.     On November 12, 2003, MSR caused $210,000.00 to be wired to the account requested by Mr. Otus. The wire specifically states: "Payment for ½ interest in Data Return joint venture, Micro Signal Research Inc./Dan Epstein Thanks."

16.     On November 12, 2003, Mr. Epstein sent an email to Mr. Otus confirming that the wire had been completed.

17.     From November 12, 2003 forward, Mr. Otus represented to Mr. Epstein that Mr. Otus had secured an agreement to buy the contemplated equipment and stated that he had MSR's cash in escrow in order to facilitate that purchase. Mr. Otus also represented that there were so-called deals "in the works" to sell the equipment at a profit. Despite these representations, MSR now knows Mr. Otus never made a deal to purchase the equipment. Moreover, from about December 2003 forward, Mr. Otus began to avoid an accounting on the deal and/or the return of MSR's money.

18.     On or about December 21, 2003, Mr. Epstein requested that Mr. Otus return the $210,000.00 via wire transfer. Mr. Otus did not respond.

19.     On December 28, 2003, Mr. Epstein sent another email requesting the wire transfer. Throughout this time, MSR would have been satisfied if Mr. Otus purchased and re-sold the equipment as he was supposed to do in lieu of a return of the money. Yet, Mr. Otus was unable to provide proof that he had purchased the equipment.

20.     Thereafter, Mr. Otus made excuse after excuse for his failure to wire the money back to MSR – each of which turned out to be a misrepresentation. On one occasion, Mr. Otus even advised Mr. Epstein that his mother had fallen seriously ill from bypass surgery as an excuse for his failure to follow-through on his promises.

21.    As of January 23, 2004, Mr. Epstein was scheduling a trip to travel to

California to examine and pick up the equipment that was a portion of the deal which was

supposedly located in Pleasanton, California.  At this time, Mr. Otus refused to provide

Mr. Epstein with even an address where he could view the equipment.

22.    On February 4, 2004, at approximately 1:20 a.m., after months of trying to

ascertain a straight answer from Mr. Otus, Mr. Epstein wrote the following email:

> Nuri, I can't believe that I have to write an email like this but enough
> is enough. YOUR NOT A 5 YEAR OLD. I have been very patient for
> months now and don't need to be jerked around anymore. I am sorry
> about your mother, about your dog, about your kids practice and try
> outs, and about your birthday. Business is business and it is time to
> take care of it. It is just plain inconsiderate that in 3 months you have
> not sent me the address of where I need to go Friday, I have asked and
> reminded you at least 10 times. You have had time to send me emails
> saying you will call, with new equipment lists to look at but no
> address. I have postponed my plans, re-adjusted my schedule, my
> business, my vacation, my oral surgery, fucked up my accounting and
> had me make reservations at least 4 times now. You have held on to
> my 210K for 3 months. THE answer is not to give me my money back
> but to take care of business and go do what you have to do. Times up. I
> don't want to discuss this again. Send me the address in Pleasanton
> and the contact person. Go to Texas and get it done."

23.    On Wednesday, February 4, 2004, Mr. Otus simply responded:

I NEVER check this email, so do not reply to this email address. I cannot
access the phone numbers because exchange is down. I have been unable
to access email since 5 or so yesterday afternoon. Sorry for the delay. Will
call you in around 20 minutes. 5557 Gilbralter Dr., Pleasantan, CA, Cory
Silvers, 3239 Irving Road, Dallas Tx 75247, James Roberson.

Mr. Epstein later found out that several items in this e-mail were inaccurate.  First, the

address in Pleasanton, California was wrong.  Second, the contact person in California

was incorrect.  Finally, the contact person in Texas was incorrect.  MSR now believes

Mr. Otus was purposefully leading it on a wild goose chase.

24.     By February 18, 2004, Mr. Epstein believed, based upon his representations, that Mr. Otus had picked up the equipment in Texas and had transported it to California. At that point, Mr. Epstein continually requested that Mr. Otus send him certain SMI cards from the Dallas equipment because he had a purchaser willing to buy those items at a good price. Mr. Otus had no affirmative response and never produced the equipment.

25.     After the preceding correspondence, Mr. Epstein made repeated requests for a telephone number for a contact person that were holding the California portion of the equipment so that MSR could be there for the pick up, but Mr. Otus failed to provide a contact.

26.     On March 9, 2004, Mr. Epstein sent another e-mail requesting the telephone number of the contact person who was supposed to meet MSR to pick up the equipment, but again received no response.

27.     In April 2004, concerned with Mr. Otus' runaround tactics, Mr. Epstein traveled to California to the address where Mr. Otus had represented the equipment was being stored to see the equipment first-hand. When Mr. Epstein arrived at the address provided by Mr. Otus, however, he found that he had provided an incorrect address. Exasperated, Mr. Epstein rode around the block and fortuitously found a building with a sign outside with the company name ("Data Return") where the equipment was supposed to be held. Mr. Epstein asked someone leaving the building if either Cory or Greg (the supposed contact persons) were there. Mr. Epstein was told that these persons were in Texas, not at the California facility. The person who assisted Mr. Epstein called the Texas office for him. Mr. Epstein spoke to Cory, who had a different last name than

the one provided by Mr. Otus, and she told him that the equipment had actually been sold to another liquidator (i.e., not AuctioNet or its principals) four (4) months earlier (in November 2003) and that neither Mr. Otus nor AuctioNet had purchased or received the equipment. Mr. Epstein immediately called Mr. Otus' counsel David S. Greenseid, Esq. and advised him what he had just learned, and inquired about the whereabouts of MSR's $210,000. After hearing the facts, Mr. Greenseid stated that he could no longer speak to Mr. Epstein. Mr. Epstein then received a call from Mr. Otus. He apologized and stated that he had meant to tell Mr. Epstein that he had never picked up the equipment. He stated he would return the money and that he could borrow the money from his mother to repay MSR. He requested that Mr. Epstein not go to the authorities, but rather allow him time to repay MSR.

28. On April 6, 2004, still having not received the return of the $210,000, Mr. Epstein wrote to Mr. Otus, Ms. Cunningham and Greg Quiroga recounting the relevant facts of this matter: that in November MSR wired $210,000 at Mr. Otus' request "for the specific purpose of securing and purchasing one half interest in equipment as part of a joint venture (portion of which I viewed personally) outlined on the spread sheets you provided." Mr. Epstein wrote that: "[y]ou stated that you had a signed contract with Data Return to purchase said equipment." Mr. Epstein further wrote that "[o]n numerous occasions you stated we were to pick up the equipment and had me ma[ke] arrangements to be in CA to do such [but on] every occasions to pick up the equipment you informed me an hour or less before going to the plane that we could not pick up the equipment due [to] schedule conflicts, heart attacks, and broken arms to name just a few" examples. Mr. Epstein mentioned the fact that he traveled to California, at which

time Mr. Epstein learned that Mr. Otus and AuctioNet had actually not even purchased the contemplated equipment. Mr. Epstein stated the fact that MSR had been defrauded and demanded the return of the $210,000.00.

29.    From April 2004 to approximately June 2004, Mr. Otus, through himself and his attorney, David S. Greenseid, acknowledged that they owed MSR $210,000 and assured Mr. Epstein that the money would be returned.

30.    On June 20, 2004, Mr. Epstein sent a certified letter to Mr. Otus through counsel demanding repayment of the $210,000.00, plus attorney's fees.

31.    On June 22, 2004, Mr. Epstein received a telephone call from Attorney Greenseid. Mr. Epstein instructed his counsel to return the telephone call. On that date, Mr. Epstein's counsel forwarded the demand letter to Attorney Greenseid via facsimile.

32.    On June 22, 2004, Attorney Greenseid provided MSR's counsel with a letter, via facsimile, in which he stated that he was in receipt of the June 20, 2004 letter, that his client disagreed with many of the factual assertions contained therein, "but he wants to reassure Mr. Epstein that it is his [Mr. Otus'] intention to repay him $210,000.00." Attorney Greenseid stated "that Mr. Otus is in the final stages of refinancing his home after which he will be in a position to pay Mr. Epstein. I am informed that the funds are scheduled to become available within the first or second week after July 4—probably within the first week. As soon as the funds become available to Mr. Otus, it is his intention to forward $210,000.00 to Mr. Epstein." Id. Attorney Greenseid continued: "I understand Mr. Epstein's skepticism, but please advise him that every indication I have is that he will be paid within the time frame I have described. In our past discussions, I was only able to describe a process, not a time

frame. Please advise whether Mr. Epstein would prefer a check or a wire transfer, and, if the latter, please give me wire transfer instructions." Id.

33.     Despite these reassurances, Mr. Otus refused service of the June 20, 2004 certified letters.

34.     Between June 22, 2004 and July 19, 2004, Attorney Greenseid and MSR's counsel engaged in several conversations regarding the failure of Mr. Otus to forward the $210,000.

35.     On July 19, 2004, Attorney Greenseid forwarded a second letter to MSR's counsel, via facsimile, in which he advised that the "funding of Mr. Otus' refinancing has been delayed by some documentation problems.  These appear to be resolved now. Accompanying are a copy of the Mortgage Loan Commitment letter to Nuri Otus and a copy of a letter from his bank informing him of the correction of two errors in his credit report. Barring any further delays, the funding of his loan and the payment to your client will take place within the next couple of weeks."

36.     The accompanying documents were a letter to Mr. Otus and Ms. Cunningham from Wells Fargo Home Mortgage and a document entitled "Mortgage Loan Commitment" that identified the lender as Dana Capital Group, Inc.  Both MSR's counsel and Mr. Epstein contacted Dana Capital, Inc. which stated that it did not have an application for financing from Mr. Otus.

37.     Based on Mr. Otus' counsel's representations regarding repayment, Mr. Epstein instructed MSR's counsel to refrain from pursuing immediate legal action.

38.     As of August 23, 2004, Mr. Otus had still not provided MSR with any funds, despite repeated assurances made to them by Mr. Otus' attorney, Mr. Greenseid.

39.     On August 23, 2004, Attorney Greenseid directed another letter to Mr. Epstein's counsel, via facsimile, writing that this "will confirm ou[r] telephone conversation of this date in which I advised you that on my return from my vacation on August 20, I was informed by Nuri Otus' wife that the paperwork for the refinance of their home should be completed by the end of this week and funding should occur within a few days afterward."

40.     As of September 10, 2004, MSR had still not received any funds and repeated calls to Mr. Otus' counsel from my attorney were not returned.

41.     On September 10, 2004, Attorney Greenseid wrote another letter to MSR's counsel, confirming a telephone conversation "in which I advised you that the information I received this morning is that the paperwork for my client's refinancing is imminent—by the end of the day or by Monday. Thereafter, the loan will be funded within five (5) business days. Should there be any change in this information, I shall advise you forthwith. I will prepare a full and final release for your review and Mr. Epstein's signature setting forth my client's agreement to pay to Mr. Epstein the sum of $250,000 immediately upon his receipt of the funds. Please provide Mr. Epstein's account information so we can arrange a wire transfer of the funds. Please advise Mr. Epstein that my client is grateful for his forbearance and patience during these prolonged delays."

42.     At this point, MSR and its counsel were not satisfied with Mr. Otus' word and requested that Attorney Greenseid contact the mortgage broker directly. Attorney Greenseid directed a second letter to MSR's counsel, via facsimile, on September 10,

2004, advising that he spoke with his client's loan broker that day and the paperwork for his refinancing was imminent—by the end of the day or by Monday.

43.     By mid-September 2004, MSR had still received no funds and numerous telephone calls to Attorney Greenseid by MSR's counsel were not returned.

44.     On October 1, 2004, Attorney Greenseid directed yet another facsimile to MSR's counsel, which stated: "Here is the long-awaited letter. Apparently the left hand does not know what the right hand is doing: the appraiser was saying he had not gotten paid and my client had to fax the canceled check from May. Call me if you questions."

45.     On or about October 25, 2004, Mr. Epstein received an e-mail from Mr. Otus who is now apparently conducting auctions (of the type of equipment that he had induced MSR to purchase) but under a new name: Asset Management Associates (amalimited.com). Clearly, Mr. Otus is using his AuctioNet e-mail contact list because he otherwise would not have sent notice of his latest auction to MSR and others known to MSR. Meanwhile, the so-called Auctionet.com web site is no longer accessible on the internet.

46.     The Court should note that on "Craig's List" Mr. Otus has an advertisement in which he states that he will purchase equipment from prospective sellers. The e-mail states that he will pay cash for equipment. This indicates there may be an ownership interest by Mr. Otus in the equipment he proposes to auction on October 28, 2004. This also indicates that he is purchasing new equipment with MSR's money rather than repaying MSR.

47.     Given the status of this matter, including Mr. Otus' promise to repay the $210,000 owed to MSR and the continued failure to do so coupled with the fact that Mr.

Otus' and Ms. Cunningham's company (AuctioNet) was apparently never incorporated

with any secretary of state and the fact that the named defendants are now operating

under a different name, MSR has a reasonable fear that without immediate equitable

relief from this Court, Mr. Otus and Ms. Cunningham shall dissipate their assets and

MSR will be unable to satisfy a judgment against them.  MSR has no knowledge that

any of the named defendants have insurance that would cover a judgment in this matter

and, therefore, MSR believes that the defendants have no such insurance.

## COUNT I
(Conversion v. Mr. Otus and Ms. Cunningham)

48.     Plaintiff restates and realleges all previous paragraphs and incorporates

them herein by reference.

49.     In or about September 2003, Otus began discussions with Epstein

regarding a business venture regarding the purchase and re-sale of used equipment – to be

sold at a profit that would be divided by both venture partners.

50.     In November 2003, Mr. Otus made repeated representations, both via

electronic mail and telephonic communications, that he needed Epstein to wire $210,000

(Epstein's purported share in the venture) to AuctioNet so it could purchase the

equipment.

51.     On November 12, 2003, and based on Mr. Otus' representations, Epstein

wired $210,000.00 to Mr. Otus for the purpose of purchasing the equipment.

52.     Mr. Otus received the funds and has repeatedly acknowledged receipt of

the funds.

53.     Instead of utilizing the funds as represented, Mr. Otus and Ms.

Cunningham have converted the funds to their own personal use.

54.    Mr. Otus has made repeated misrepresentations that he intends to return the funds, but has failed to return the funds.

55.    As a result of their unlawful acts, Mr. Otus and Ms. Cunningham have converted to their own use said $210,000.00, the property of Plaintiff, and Plaintiff is entitled to a return of the money, plus interest and costs.

## COUNT II
(Money Had and Received v. Mr. Otus and Ms. Cunningham)

56.    Plaintiff restates and realleges all previous paragraphs and incorporates them herein by reference.

57.    On or about November 12, 2003, MSR wired $210,000.00 to the account of Mr. Otus and Ms. Cunningham, doing business as AuctioNet, Inc.

58.    Mr. Otus and Ms. Cunningham represented that the money would be used to purchase used equipment, which would later be sold at a profit that would inure to the benefit of MSR.

59.    Instead, Defendants utilized the money for their own personal benefit and have refused to return it.

60.    The sum of money should not in justice be retained by the defendants and in equity and good conscience should be paid to the Plaintiff.

## COUNT III

(Fraud, Misrepresentation and Deceit v. Mr. Otus and Ms. Cunningham)

61.    Plaintiff restates and realleges each of the above paragraphs and incorporates them herein by reference.

62.    Mr. Otus and Ms. Cunningham, through her agent Mr. Otus, made oral and written false statements to Plaintiff as set forth in detail above.

14

63.    Defendants' misrepresentations regarded facts that reasonable people would consider important to their decisions to enter into a joint venture agreement and to provide funds to a business and to refrain from taking legal action.

64.    Defendants knew their statements were false at the time that the statements were made.

65.    Defendants' made their false statements with the intention that Plaintiff would rely on those statements.

66.    In making the decisions regarding the matters set forth in this Complaint, MSR did, in fact, rely on Defendant's statements.

67.    Plaintiff suffered financial loss as a result of its reliance on Defendants' misrepresentations and is entitled to recover all damages for same, plus interest and costs.

## COUNT IV
### (Breach of Contract v. All Defendants)

68.    Plaintiff restates and realleges each of the foregoing paragraphs as if fully set forth herein.

69.    The joint venture agreement discussed herein is a valid and binding contract.

70.    Defendants breached the express and implied terms of the contract through the conduct alleged herein.

71.    Plaintiff satisfied all of its obligations under the terms of agreement, including providing Defendants $210,000.

72.    The breaches of contract discussed herein have caused Plaintiff to sustain damages.

73.     Plaintiff is entitled to be compensated for all harm sustained as a result of Defendants' breaches, plus interest, costs, and attorney's fees.

## COUNT V
(Violation of Mass. Gen L. c. 93A v. All Defendants)

74.     Plaintiff restates and realleges each of the foregoing paragraphs as if fully set forth herein.

75.     At all relevant times hereto, Defendants were engaged in trade or commerce within the Commonwealth of Massachusetts – specifically engaged in the joint venture business discussed above.

76.     Defendants' conduct violates, among other things, G.L. c. 93A §, § 2, 11.

77.     Defendants' actions described herein were performed willfully and knowingly.

78.     As a result of Defendants' unfair and deceptive conduct, Plaintiff sustained injuries, including but not limited to, a loss of its $210,000, out of pocket expenses to mitigate the issues described herein, and unnecessary litigation costs and expenses, including attorney's fees, associated with the pursuit of this matter and the filing of this action.

79.     Plaintiff is entitled to be compensated for all harm sustained by him and to all damages allowed by law, including double or treble damages, costs, interest and attorney's fees.

## COUNT VI
(Unjust Enrichment v. All Defendants)

80.     Plaintiff restates and realleges each of the foregoing paragraphs as if fully set forth herein.

81.    By the wrongful acts described above, Defendants have been unjustly enriched to the detriment of MSR, including but not limited to accepting $210,000 without intending to use it as proposed and then failing to repay the money.

82.    By reason of the foregoing, MSR has suffered damages for which Defendants are legally responsible and MSR is entitled to be compensated for same in an amount to be determined at trial, plus interest and costs.

## COUNT VII
(Breach of Implied Covenant of Good Faith and Fair Dealing v. All Defendants)

83.    Plaintiff restates and realleges each of the foregoing paragraphs as if fully set forth herein.

84.    The joint venture agreement carried with it an implied covenant of good faith and fair dealing between the parties.

85.    As described above, Defendants breached their covenant of good faith and fair dealing and acted in bad faith in regards to the joint venture.

86.    As a result of these breaches of the covenant of good faith and fair dealing, MSR suffered and continues to suffer damages and is entitled to be compensated for same in an amount to be determined at trial, plus interest and costs.

## COUNT VIII
(Temporary Restraining Order, Preliminary and Permanent Injunction v. All Defendants)

87.    Plaintiff restates and realleges each of the above paragraphs and incorporates them herein by reference.

88.    The conduct as alleged herein is causing ongoing and irreparable harm to MSR. Among other things, it appears that Defendants, after acknowledging the debt and agreeing to repay it, have started a new business with the money and intend not to repay

it. Given their actions, it appears likely that should the Court not enter an order to preserve the status quo, these Defendants will be unable to repay MSR and MSR shall have no adequate remedy at law at the conclusion of this case.

89.    Remedies at law, by themselves, are inadequate to compensate Plaintiff's harm.

90.    This Honorable Court should use its equitable powers to enjoin the irreparable harm being caused by the conduct of all Defendants, including entering a temporary restraining order and thereafter a permanent injunction enjoining Defendants from failing to pay over to MSR and/or this Court all funds (up to $210,000) they are presently earning from the new business entity, including any funds received in the auction they are advertising on October 28, 2004.

### COUNT IX
(Request for Trustee Process and Real Estate Attachments v. All Defendants)

91.    Plaintiff restates and realleges each of the above paragraphs and incorporates them herein by reference.

92.    The conduct as alleged herein is causing ongoing and irreparable harm to MSR. Among other things, it appears that Defendants, after acknowledging the debt and agreeing to repay it, have started a new business with the money and intend not to repay it. Given their actions, it appears likely that should the Court not enter an order to preserve the status quo, these Defendants will be unable to repay MSR and MSR shall have no adequate remedy at law at the conclusion of this case.

93.    Remedies at law, by themselves, are inadequate to compensate Plaintiff's harm.

94.    This Honorable Court should use its equitable powers by entering a trustee process attachment of all funds (up to $210,000) held in the name of Mr. Otus and Ms. Cunningham at Cupertino National Bank & Trust and attach any and all real property (up to $210,000) in the names of Mr. Otus and Ms. Cunningham found in Massachusetts or California.

**WHEREFORE**, MSR hereby requests that this Honorable Court:

1.    Enter judgment in his favor on each count of this complaint;

2.    Award all damages to which MSR is entitled, including interest and costs;

3.    Award all damages allowed under G.L. c. 93A, including double or treble damages, costs, interest and attorney's fees;

4.    Enter the Temporary Restraining Order, Permanent Injunction, Trustee Process Attachment and Real Property Attachment requested herein; and

5.    Award such other and further relief as is just and equitable.

## JURY DEMAND

MSR hereby demands a trial by jury on all counts so triable.

Respectfully submitted,

**MICRO SIGNAL RESEARCH, INC.**,

By its attorney,

Timothy J. Perry (BBO #631397)
PERRY, KRUMSIEK & WAYLAND LLP
114 State Street
Boston, MA 02109
(617) 742-9012
fax (617) 742-9013

19