UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICRO SIGNAL RESEARCH, INC. | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | ) CIVIL ACTION NO.<br>) |
| NURI OTUS and MAUREEN CUNNINGHAM, | )<br>)  04-12300 EFH |
| Defendants. | )<br>) |

## AFFIDAVIT OF DANIEL EPSTEIN

I, Daniel Epstein, on oath do hereby depose and state as follows:

1. I am the President of Plaintiff Micro Signal Research, Inc. ("Plaintiff" or "MSR"). MSR is a corporation registered to do business in the Commonwealth of Massachusetts with a principal place of business at 50 Oakdale Avenue, Weston, Massachusetts.

2. Upon information and belief, Defendant Nuri Otus ("Mr. Otus") is an individual residing at 1872 Black Mountain Road, Hillsborough, CA 94010. At times relevant to this Complaint, Mr. Otus held himself out as the owner of AuctioNet, Inc. d/b/a actionet.com ("AuctioNet"), a company he purported had offices at 1204 Middlefield Road, Suite 2C, Redwood City, CA 94063, and a P.O. Box 631, Burlingame, CA 94011.

3. Upon information and belief, Defendant Maureen Cunningham ("Ms. Cunningham") is an individual residing at 1872 Black Mountain Road, Hillsborough,

California. Ms. Cunningham is Mr. Otus' wife and I understood her to be a purported "vice president" and chief financial officer of AuctioNet.

4. AuctioNet operated at a business address located at 1204 Middlefield Road, Suite 2C, Redwood City, CA 94063 and P.O. Box 631, Burlingame, CA 94011.

5. Mr. Otus represented that AuctioNet engaged in the business of buying and selling, privately and at auction, used equipment. MSR had a previous business relationship with AuctioNet through Mr. Otus in that MSR bought equipment both directly and at auction from AuctioNet in the past. In or about September 2003, Mr. Otus held himself out to me as owner and "auctioneer" of AuctioNet. It appears that there was never an entity incorporated either with the California or Massachusetts secretary of state under the name AuctioNet. True copies of Secretary of State searches in California and Massachusetts under that name are attached hereto as Exhibit 1.

6. In or about late October 2003, I was President of MSR.

7. In or about late October 2003, in his purported capacity as owner of AuctioNet, Mr. Otus proposed a joint business venture between AuctioNet and MSR. The venture would purchase certain electronic equipment, which would later be sold at a profit privately and/or through auction. I went to see a portion of the equipment proposed to be acquired with Mr. Otus in Dallas, Texas in or around early November 2003. The remaining equipment was purported by Mr. Otus to be in Pleasanton, California.

8. Ultimately, the parties agreed to terms on the joint venture. The agreement provided that both parties would offer their expertise and services to the venture, along with a division of the costs, responsibilities and management duties.

9. The deal between AuctioNet, primarily through Mr. Otus' representations, and MSR is reflected in a series of e-mails exchanged from about October 24, 2003 to November 11, 2003. True copies of these e-mails are attached hereto as Exhibit 2.

10. In order to induce MSR to enter the joint venture, Mr. Otus provided me, via e-mail, with a list of the equipment that was to be purchased and re-sold. A true copy of the e-mail showing the equipment list attached hereto as Exhibit 3.

11. On or about November 10, 2003, Mr. Otus sent me an email communication instructing me to wire $210,000.00 to the Cupertino National Bank & Trust, 3 Palo Alto Square, Suite 150, Palo Alto, California, payable to AuctioNet.com, 1204 Middlefield Road, Redwood City, California, with a reference of "Data Return JV", a bank routing number of 121151152, and an account number 003110397. A true copy of this e-mail is attached hereto as Exhibit 4.

12. In a return email message, I advised Mr. Otus that I was wiring him the $210,000.00 "today for my half share in the Data-Return deal on the spread sheets." A true copy of this e-mail is attached hereto as Exhibit 5.

13. On November 12, 2003, MSR caused $210,000.00 to be wired to the account requested by Mr. Otus. A true copy of the Bank Statement showing this transfer is attached hereto as Exhibit 6. The wire specifically states: "Payment for ½ interest in Data Return joint venture, Micro Signal Research Inc./Dan Epstein Thanks."

14. On November 12, 2003, I sent an email to Mr. Otus confirming that the wire had been completed. A true copy of this e-mail is attached hereto as Exhibit 7.

15. From November 12, 2003 forward, Mr. Otus represented to me that he had secured an agreement to buy the contemplated equipment and stated that he had MSR's

cash in escrow in order to facilitate that purchase. Mr. Otus also represented that there were so-called deals "in the works" to sell the equipment at a profit. True copies of e-mails expressing these sentiments are attached hereto as Exhibit 8. Despite these representations, MSR now knows Mr. Otus never made a deal to purchase the equipment. Moreover, from about December 2003 forward, Mr. Otus began to avoid an accounting on the deal and/or the return of MSR's money.

16. On or about December 21, 2003, I requested that Mr. Otus return the $210,000.00 via wire transfer. Mr. Otus did not respond.

17. On December 28, 2003, I sent another email requesting the wire transfer. A true copy of the relevant e-mail is attached hereto as Exhibit 9. Throughout this time, MSR would have been satisfied if Mr. Otus purchased and re-sold the equipment as he was supposed to do in lieu of a return of the money. Yet, Mr. Otus was unable to provide proof that he had purchased the equipment.

18. Thereafter, Mr. Otus made excuse after excuse for his failure to wire the money back to MSR – each of which turned out to be a misrepresentation. On one occasion Mr. Otus even advised me that his mother had fallen seriously ill from bypass surgery as an excuse for his failure to follow-through on his promises.

19. As of January 23, 2004, I was scheduling a trip to travel to California to examine and pick up the equipment that was a portion of the deal which was supposedly located in Pleasanton, California. At this time, Mr. Otus refused to provide me with even an address where I could view the equipment. True copies of e-mails regarding the trip and the requests for an address are attached hereto as Exhibit 11.

20. On February 4, 2004, at approximately 1:20 a.m., after months of trying to ascertain a straight answer from Mr. Otus, I wrote the following email:

> Nuri, I can't believe that I have to write an email like this but enough is enough. YOUR NOT A 5 YEAR OLD. I have been very patient for months now and don't need to be jerked around anymore. I am sorry about your mother, about your dog, about your kids practice and try outs, and about your birthday. Business is business and it is time to take care of it. It is just plain inconsiderate that in 3 months you have not sent me the address of where I need to go Friday, I have asked and reminded you at least 10 times. You have had time to send me emails saying you will call, with new equipment lists to look at but no address. I have postponed my plans, re-adjusted my schedule, my business, my vacation, my oral surgery, fucked up my accounting and had me make reservations at least 4 times now. You have held on to my 210K for 3 months. THE answer is not to give me my money back but to take care of business and go do what you have to do. Times up. I don't want to discuss this again. Send me the address in Pleasanton and the contact person. Go to Texas and get it done."

A true copy of this e-mail is attached hereto as Exhibit 12.

21. On Wednesday, February 4, 2004, Mr. Otus simply responded:

I NEVER check this email, so do not reply to this email address. I cannot access the phone numbers because exchange is down. I have been unable to access email since 5 or so yesterday afternoon. Sorry for the delay. Will call you in around 20 minutes. 5557 Gilbralter Dr., Pleasantan, CA, Cory Silvers, 3239 Irving Road, Dallas Tx 75247, James Roberson.

A true copy of this e-mail is attached hereto as Exhibit 12. I later found out that several items in this e-mail were inaccurate. First, the address in Pleasanton, California was wrong. Second, the contact person in California was incorrect. Finally, the contact person in Texas was incorrect. I now believe Mr. Otus was purposefully leading me on a wild goose chase.

22. By February 18, 2004, I believed, based upon his representations, that Mr. Otus had picked up the equipment in Texas and had transported it to California. At that point, I continually requested that he send me certain SMI cards from the Dallas

equipment because I had a purchaser willing to buy those items at a good price. True copies of e-mails reflecting that request are attached hereto as Exhibit 14. Mr. Otus had no affirmative response and never produced the equipment.

23. After the preceding correspondence, I made repeated requests for a telephone number for a contact person that were holding the California portion of the equipment so that I could be there for the pick up, but Mr. Otus failed to provide a contact. True copies of e-mails to Mr. Otus reflecting these requests are attached hereto as Exhibit 15.

24. On March 9, 2004, I sent another e-mail requesting the telephone number of the contact person who was supposed to meet MSR to pick up the equipment, but again received no response. A true copy of this e-mail is attached hereto as Exhibit 16.

25. In April 2004, concerned with Mr. Otus' runaround tactics, I traveled to California to the address where Mr. Otus had represented the equipment was being stored to see the equipment first-hand. When I arrived at the address provided by Mr. Otus, I found that he had provided an incorrect address. Exasperated, I rode around the block and fortuitously found a building with a sign outside with the company name ("Data Return") where the equipment was supposed to be held. I asked someone leaving the building if either Cory or Greg (my supposed contact persons) were there. I was told that these persons were in Texas, not at the California facility. The person who assisted me called the Texas office for me. I spoke to Cory, who had a different last name than the one provided by Mr. Otus, and she told me that the equipment had actually been sold to another liquidator (i.e., not AuctioNet or its principals) four (4) months earlier (in November 2003) and that neither Mr. Otus nor AuctioNet had purchased or received the

equipment. I immediately called Mr. Otus' counsel David S. Greenseid, Esq. and advised him what I had just learned, and inquired about the whereabouts of MSR's $210,000. After hearing the facts, Mr. Greenseid stated that he could no longer speak to me. I then received a call from Mr. Otus. He apologized and stated that he had meant to tell me that he had never picked up the equipment. He stated he would return the money and that he could borrow the money from his mother to repay MSR. He requested that I not go to the authorities and allow him time to repay him.

26.   On April 6, 2004, still having not received the return of the $210,000, I wrote to Mr. Otus, Ms. Cunningham and Greg Quiroga recounting the relevant facts of this matter: that in November MSR wired $210,000 at Mr. Otus' request "for the specific purpose of securing and purchasing one half interest in equipment as part of a joint venture (portion of which I viewed personally) outlined on the spread sheets you provided." A true copy of this letter attached hereto as Exhibit 17. I wrote that: "[y]ou stated that you had a signed contract with Data Return to purchase said equipment." I further wrote that "[o]n numerous occasions you stated we were to pick up the equipment and had me ma[ke] arrangements to be in CA to do such [but on] every occasions to pick up the equipment you informed me an hour or less before going to the plane that we could not pick up the equipment due [to] schedule conflicts, heart attacks, and broken arms to name just a few" examples. I mentioned the fact that I traveled to California, at which time I learned that Mr. Otus and AuctioNet had actually not even purchased the contemplated equipment. I stated the fact that MSR had been defrauded and I demanded the return of the $210,000.00.

27.	From April 2004 to approximately June 2004, Mr. Otus, through himself and his attorney, David S. Greenseid, acknowledged that they owed MSR $210,000 and assured me that the money would be returned.

28.	On June 20, 2004, I sent a certified letter to Mr. Otus through my counsel demanding repayment of the $210,000.00, plus attorney's fees. A true copy of this certified letter is attached hereto as Exhibit 18.

29.	On June 22, 2004, I received a telephone call from Attorney Greenseid. I instructed my counsel to return the telephone call. On that date, my counsel forwarded the demand letter to Attorney Greenseid via facsimile. A true copy of the facsimile showing that the letter was faxed to Mr. Greenseid is attached hereto as Exhibit 19.

30.	On June 22, 2004, Attorney Greenseid provided my counsel with a letter, via facsimile, in which he stated that he was in receipt of the June 20, 2004 letter, that his client disagreed with many of the factual assertions contained therein, "but he wants to reassure Mr. Epstein that it is his [Mr. Otus'] intention to repay him $210,000.00." A true copy of the June 22, 2004 letter is attached hereto as Exhibit 20. Attorney Greenseid stated "that Mr. Otus is in the final stages of refinancing his home after which he will be in a position to pay Mr. Epstein. I am informed that the funds are scheduled to become available within the first or second week after July 4—probably within the first week. As soon as the funds become available to Mr. Otus, it is his intention to forward $210,000.00 to Mr. Epstein." Id. Attorney Greenseid continued: "I understand Mr. Epstein's skepticism, but please advise him that every indication I have is that he will be paid within the time frame I have described. In our past discussions, I was only able to describe a process, not a time frame. Please advise whether Mr. Epstein would

8

prefer a check or a wire transfer, and, if the latter, please give me wire transfer instructions." Id.

31.     Despite these reassurances, Mr. Otus refused service of the June 20, 2004 certified letters. True copies of the returns showing these refusals are attached hereto as Exhibit 21.

32.     Between June 22, 2004 and July 19, 2004, Attorney Greenseid and my counsel engaged in several conversations regarding the failure of Mr. Otus to forward the $210,000.

33.     On July 19, 2004, Attorney Greenseid forwarded a second letter to my counsel, via facsimile, in which he advised that the "funding of Mr. Otus' refinancing has been delayed by some documentation problems. These appear to be resolved now. Accompanying are a copy of the Mortgage Loan Commitment letter to Nuri Otus and a copy of a letter from his bank informing him of the correction of two errors in his credit report. Barring any further delays, the funding of his loan and the payment to your client will take place within the next couple of weeks." A true copy of this letter is attached hereto as Exhibit 22.

34.     The accompanying documents were a letter to Mr. Otus and Ms. Cunningham from Wells Fargo Home Mortgage and a document entitled "Mortgage Loan Commitment" that identified the lender as Dana Capital Group, Inc. Both my counsel and I contacted Dana Capital, Inc. who informed us that they did not have an application for financing from Mr. Otus.

35.     Based on these representations, I instructed my counsel to refrain from pursuing immediate legal action.

36. As of August 23, 2004, Mr. Otus had still not provided me with any funds, despite repeated assurances made to me by Mr. Otus' attorney, Mr. Greenseid.

37. On August 23, 2004, Attorney Greenseid directed another letter to my counsel, via facsimile, writing that this "will confirm ou[r] telephone conversation of this date in which I advised you that on my return from my vacation on August 20, I was informed by Nuri Otus' wife that the paperwork for the refinance of their home should be completed by the end of this week and funding should occur within a few days afterward." A true copy of this letter is attached hereto as Exhibit 23.

38. As of September 10, 2004, MSR had still not received any funds and repeated calls to Mr. Otus' counsel from my attorney were not returned.

39. On September 10, 2004, Attorney Greenseid wrote another letter to my counsel, confirming a telephone conversation "in which I advised you that the information I received this morning is that the paperwork for my client's refinancing is imminent—by the end of the day or by Monday. Thereafter, the loan will be funded within five (5) business days. Should there be any change in this information, I shall advise you forthwith. I will prepare a full and final release for your review and Mr. Epstein's signature setting forth my client's agreement to pay to Mr. Epstein the sum of $250,000 immediately upon his receipt of the funds. Please provide Mr. Epstein's account information so we can arrange a wire transfer of the funds. Please advise Mr. Epstein that my client is grateful for his forbearance and patience during these prolonged delays." A true copy of this letter attached hereto as Exhibit 24.

40. At this point, my counsel and I were not satisfied with Mr. Otus' word and requested that Attorney Greenseid contact the mortgage broker directly. Attorney

Greenseid directed a second letter to my counsel, via facsimile, on September 10, 2004, advising that he spoke with his client's loan broker that day and the paperwork for his refinancing was imminent—by the end of the day or by Monday. A true copy of this letter is attached hereto as Exhibit 25.

41.  By mid-September 2004, MSR had still received no funds and numerous telephone calls to Attorney Greenseid by my counsel were not returned.

42.  On October 1, 2004, Attorney Greenseid directed yet another facsimile to my counsel, which stated: "Here is the long-awaited letter. Apparently the left hand does not know what the right hand is doing: the appraiser was saying he had not gotten paid and my client had to fax the canceled check from May. Call me if you questions." A true copy of this letter is attached hereto as Exhibit 26.

43.  On or about October 25, 2004, I received an e-mail from Mr. Otus who is now apparently conducting auctions (of the type of equipment that he had induced me to purchase) but under a new name: Asset Management Associates (amalimited.com). Clearly, Mr. Otus is using his ActioNet e-mail contact list because he otherwise would not have sent notice of his latest auction to me and others known to me. Meanwhile, the so-called Auctionet.com web site is no longer accessible on the internet. A true copy of the web page showing the site to be inaccessible is attached hereto as Exhibit 28.

44.  The Court should note that on "Craig's List" Mr. Otus has an advertisement in which he states that he will purchase equipment from prospective sellers. A true copy of this advertisement is attached hereto as Exhibit 29. The e-mail states that he will pay cash for equipment. This indicates there may be an ownership interest by Mr. Otus in the equipment he proposes to auction on October 28, 2004.

45.  Given the status of this matter, including Mr. Otus' promise to repay the $210,000 owed to MSR and the continued failure to do so coupled with the fact that Mr. Otus' and Ms. Cunningham's company (AuctioNet) was apparently never incorporated with any secretary of state and the fact that the named defendants are now operating under a different name, I have a reasonable fear that without immediate equitable relief from this Court, Mr. Otus and Ms. Cunningham shall dissipate their assets and I will be unable to satisfy a judgment against them. I have no knowledge that any of the named defendants have insurance that would cover a judgment in this matter and, therefore, I believe that the defendants have no such insurance.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 27TH DAY OF OCTOBER 2004.**

Daniel Epstein
President, Micro Signal Research, Inc.